The last case for the morning is 19-1266, Loxo Oncology v. Array, perhaps Biopharma. That's correct, Your Honor. May it please the Court, Charles Verhoeven on behalf of Appellant Array. Array brings this appeal on the denial of the preliminary injunction based solely on irreparable harm for two reasons. First, the Court applied the wrong standard for assessing irreparable harm in this particular case, which is a threatened misappropriation case primarily. And second, the District Court looked at the wrong harm. The District Court looked at things that weren't even alleged to be the harm. They looked to whether there would be FDA approval a few years down the road. And what we were pointing to is the fact that this is a research and development area that other people, everybody's trying to, well, not everybody, but people are trying to discover new things. And our guys from our company spent years working and developing and finding solutions for these things. And they all left, well, two left a couple of years before. We received assurances that there would be protection. And then we find out that what they did was they built a, from scratch, a competing research and development lab in the same town. Well, is there any evidence that they used the information that they had learned in your client's employee? Well, we presented evidence below, Your Honor. It was under seal because both sides wanted to be protected. Well, tell us the answer. Yes. And it was primarily from our expert witness who had access to both sides' technology. And he went through and he, you can't really look at the transcript that much because the transcript is open to the public. So you have to look at his declaration. And he went through extensively and made some, and testified that they're already using some of our technology and that there was a grave risk that they would be able to basically leapfrog or skip all the research and development. So why wouldn't that be cured if the district judge issues a permanent injunction at the conclusion of the trial to say that LOXO cannot patent any of these products? Well, that would involve a bunch of, I guess, issues. But let me address the end-of-trial issue. So at the end of the trial, if we ask for a permanent injunction, is the judge going to come back and say, no, because FDA approval is not for years, and even though you've shown that they've taken some stuff, there's no irreparable harm because we don't know if you're going to get FDA approval or not. Well, isn't there a big difference? Because irreparable harm is an element of a claim for a permanent injunction and a preliminary injunction. The significant difference is that for purposes of a preliminary injunction under Rule 65, irreparable harm is only during dependency between the proceeding and the end of the case in district court. That's correct, Your Honor. And so it's that window of time. So if the district judge says that, well, maybe the issue, the denial of a permanent injunction, would be reversible error. But your answer would have no bearing on whether or not there was irreparable harm between the time of the district court's ruling and the conclusion of the case. No, I would submit that's not true. In fact, the thing that the court latched onto was testimony from our CEO explaining how critical it was and how harmful it would be if some of the discoveries that we made, including what doesn't work in this area, if we figured out what does work, that's extremely valuable. And he was pointing out that, you know, a lot of stuff doesn't work. A lot of people don't get FDA approval. But if we think we've got a product and all of our employees leave to join LOCSO, there is immediate irreparable harm in them developing the same products if they're able to patent it. No. Patent's a whole different subject than trade secret misappropriation. The harm is that they get a shortcut in the research and development. So, for example, just hypothetically, let's say it took five years for a rate to develop. And these are specific molecules that they're researching. Five years of research, and they figured out seven different tries didn't work, one try worked. And their scientists go to a competitor and get assigned to the very same molecule. Okay? That's where the threat is. And we've, in our expert witness, submitted evidence and documents below under SEAL showing this immediate, irreparable harm. And the court did not analyze it. But there was no evidence that they had done anything at that point. There was no non-compete agreement here. There was a non-disclosure agreement. And I was under the impression that the company went through a whole list of stuff and destroyed stuff that was agreed upon, and that there's no evidence that they disclosed anything. That's simply incorrect. There is evidence. And we submitted that evidence to the district court, and it was not looked at or analyzed. The district court only looked at, by definition, what the court looked at would be speculative. By definition. Well, the argument is that your argument is speculative, and your argument of harm is speculative. Why don't you compare this case to Waymo and WeRide, and tell me how you line up to those two cases. Sure. I was lead counsel in the Waymo case, so I know that case. Good. So the Waymo case, preliminary injunction was granted not on any actual misappropriation, just on the risk, just on the threat, because the circumstantial evidence indicated to the court that there was a grave risk and that maintaining the status quo while discovery could be taken to help show what was taken and what wasn't taken would be equitable and prudent in that case because of the risk. And that's the same thing we're talking about here. That's what I want to know. Show me, tell me, what is the basis. I mean, there you had, what, over 14,000 confidential files stolen. You have a situation where there could, I mean, it seemed to me fairly clear. There was a concrete basis. Something was going to happen to those files. There was a concrete basis that they would be used. What do you have here? And I know we're talking about asserted trade secrets, but I mean, asserted trade secrets would include this 8A and 8E, right? Well, what is it that you tell us about what they're doing with those that would give us any reason to believe we have the same sort of concrete risk here? So first, Your Honor, we allege that there was a taking of, I was representing the plaintiff in that case, and we allege that there was a taking of 14,000 confidential documents. The other side said there's no evidence of use of any of those documents. No evidence of any use. But there was a taking, though. Well, there's taking of documents here. We didn't cite to them because we didn't think it was that important. Oh, it's important. I mean, we're talking about something concrete. It was important enough for you in Waymo, wasn't it? We elected to focus on the following fact pattern. But I want to say, first of all, in Waymo, before I get to that, that there was no evidence, as of the preliminary injunction, that any of these documents had been used. We couldn't present any evidence. There was no evidence. The district court didn't even go to analyze the evidence that we did submit some trade secrets and we're in the process of developing that in the case. The district court didn't even go there. It went to the threat. I understand that. And the 14,000 documents, there's no evidence of use by Uber. And Mr. Lewandowski, the individual who downloaded them, testified that he destroyed them and never used them at Uber. In fact, that was one of Uber's biggest defenses. What I'm really trying to get at, in all sincerity here, is those cases seem to be decided correctly to me. And perhaps I'm wrong, but they seemed at first blush to make sense. So what I'm trying to understand from you is what is the analogous fact pattern here that would suggest the same magnitude of risk? Absolutely. And when you do that, I thought your Dr. Saccomano specifically clarified that when they misappropriate the trade secrets, there would be harm. Not that they have done it or that they're going to do it, but when they do it. Right. I'd like to answer the first question first. So I'll go through Waymo and then I'll answer your question. Is that okay? So in Waymo, there's evidence of wiped laptop, evidence of downloads. Here, the two individuals who left earlier and set up the whole scenario, deleted emails, wiped their laptops. I can give you sites if you'd like. Lewandowski resigned without notice and immediately started working on a self-driving, the technology here is self-driving automobiles, and immediately started working on self-driving trucks. One of their big arguments was it isn't the same thing at the preliminary injunction. Here, they've admitted that they have programs on two of the same molecules. And that's all we're asking. Stay out of the same molecules for the preliminary injunction. That's it. In Lewandowski, there was evidence that he had planned this whole thing with the CEO of Uber, Mr. Kalanick, and that they had set up a situation in advance of the employees leaving and in advance of Mr. Lewandowski leaving as well to solicit and bring those employees over while they were still working and secretly doing that while they were still working at Waymo. Here, we've got evidence that through discovery learned that, let me back up high level because this kind of goes to your question, Your Honor. There was a collaboration agreement between the two parties. And as part of that collaboration agreement, Array would do research and development on small molecules that LOXO chose. But LOXO just didn't choose them at random. Array presented to LOXO candidates and said, You should research this molecule. You should research that molecule. And explained why. In this case, they did that for the two programs, the two molecules here. Array suggested to LOXO as part of their agreement, part of their collaboration, that they investigate these two molecules. And guess what happens? LOXO says, Nah, we're not interested. And then several months later, they start doing it with our employees in a shop basically across the street that didn't exist before they hired our employees. So, you know, similar to Waymo. You know, for example, in Waymo, Uber and Levodowsky appeared to have planned the entire course of events before they left. Same thing here. Why didn't you have a non-competition agreement as opposed to just a mere non-disclosure agreement? And if I'm the scientist and I think up this deal for company A, and then I leave and go to company B, do I leave half my brain with company A and I can't do anything? No, you don't. And that's the difficulty of these types of cases. You want to protect the trade secrets, but you want to protect freedom of movement. And I'll note that in the brief submitted by LOXO, they say we're trying to prevent these individuals from working in their profession. We're trying to shut down LOXO's programs. No. There's two molecules that we presented during the collaboration agreement, and they rejected. And now they're pursuing, with our former employees, those two molecules. All right? That's a huge risk. There's many other programs at LOXO that these individuals can and are working on. In fact, these individuals who all left at the same time, my understanding from opposing counsel is they've continuously been walled off from those projects. So they're doing stuff already voluntarily that has nothing to do with these two programs. And what we're saying is the whole circumstance here presents a threat of misappropriation. Well, it's a threat that may never happen sufficient to predicate a preliminary injunction on. It may never happen, but under both the Defense of Trade Secret Act and the Colorado Trade Secret Act, the statutes expressly permit actions for threatened misappropriation as well as actual misappropriation. Doesn't it have to be based on something? Sorry? Doesn't it have to be based on some evidence? Yes. You show that there's a threat of misappropriation. And here we've shown all those facts I just went over and believe that it was a threat. And the district court didn't look at those. The district court didn't look at any of that stuff. The district court didn't even address the fact that the statute says that threatened misappropriation is a valid cause of action and how that impacts the standard that the district court applied, which gets to the appeal point. You're out of time. I was letting you finish. Oh, I'm so sorry, Your Honor. No, of course. You've got a question, so stay. Oh, OK. I'm going to buy you some time. You said, you made a comment just then, that the district court didn't even mention the fact that the threatened misappropriation standard applies under federal and state law. Isn't there a good reason for that? You never argued in any of your briefing in district court that either of the federal or state standard with regard to threatened misappropriation should bear on the existence of irreparable injury. Well, we did argue threatened misappropriation. We did cite the statute for threatened misappropriation. There wasn't a case in the Tenth Circuit on these facts that was applicable, so we relied on the threat language in the actual statutes. And our appeal, I said there's two things. One is they applied the wrong standard. In the appeal, they applied a standard from the Heidemann case, which says, quote, actual and not theoretical. And so for a threat of misappropriation trade secret case recognized by both federal and state law, that's standard conflicts. All right, so you said a lot of things. But your basic response is that you're saying that you did argue this in district court. We argued threatened misappropriation and you can get irreparable harm from threatened misappropriation. And none of that stuff was addressed. And also, I just want the court to know, we had both sides had 15 pages. So there's only 15 pages of briefing. So there's a lot of evidence that went in at the hearing where they had live testimony and in declarations. I noticed that the other side quipped that we only spent two pages on irreparable harm. I think you were. OK. I've run away with your question. I'm totally satisfied. OK. Thank you, Your Honors. Thank you. Good morning, Your Honors. I'm Jed Wakefield. Or good afternoon, Your Honors. I'm Jed Wakefield. May it please the court, represent OXO Oncology and all the individual counterclaim defendant appellees. This is not a case of first impression, as Array's briefing suggests. It's a routine denial of a preliminary injunction where the evidence fell short. I'd like to first address the standard for irreparable harm, which the district court correctly applied, and why it is fully consistent with the Defend Trade Secrets Act, and then why the district court's application of that was no abuse of discretion at all. It fell easily within the court's broad discretion. And finally, to address the issue of the heightened standard. That was a subject that was touched on in the briefing. So starting with irreparable harm, Array's argument boils down to this notion that there's something inconsistent about well-established Tenth Circuit law, that harm must be certain, great, actual, not theoretical, which is to say not speculative, and the Defend Trade Secrets Act, which allows, does not require, but permits a court in its discretion to grant an injunction to prevent either actual or threatened misappropriation. They're not inconsistent. And indeed, the district court's opinion cited that language, which is from the Heidemann case, also cited the language on irreparable harm from the Flowers case, which Array contends is correct, which is you need to show more than speculative harm. You need to show a significant risk of irreparable injury. The court cited both of those because they're not in conflict with each other, and there's no indication that what the court was thinking or what the Tenth Circuit was thinking when it issued those orders, saying certain and surely will result in those sorts of things. What the court meant was we can only enjoin conduct that is actually occurring right now, and we can only enjoin conduct that will result in harm that is certain to occur. That's not what the Tenth Circuit meant, and it's not what Judge Brimmer meant. What Judge Brimmer was applying is a well-established rule that harm can't be speculative. And here the evidence was. He also applied the well-established rule that harm must be imminent, and this goes to Judge Baccarat's question from the beginning, which is was any evidence of this alleged irreparable harm shown to be likely to occur before the trial in this case? And there was no such evidence. This was largely an inevitable disclosure case, a case about what people retained in their heads, with no evidence of any stolen molecule that was ready to go to market or anything like that. In fact- Well, why is it in a suspicious circumstance just as it was in, I guess, Waymo where you get a situation where they present two things to you? Hey, let's do these molecules. No, we're not really interested. And later you decide to use them when you have their employees. I mean, that at least would raise an eyebrow for some people, including me. So explain why shouldn't that factor into the equation of risk? Certainly, Your Honor. To simply talk about the idea of going into- and by the way, these aren't molecules. These are areas of research. These are known causes of cancer in public literature. There were discussions between these companies, which their CEO, Dr. Sakamano, described as a mere pitch about Array's capabilities, not a disclosure of detailed existing molecules. They didn't have a lead candidate, a compound, anything in these areas that were pitched. So the companies were free to work together on those or not to work together on those. And it's also worth noting that Array was the company that decided to end the collaboration between these two companies, which had been going on for years, under which there could have been other projects together. There was no exclusivity requirement in the agreement between the parties. There was no non-compete between these companies. And Loxo Oncology was free to go pursue its own research in these areas once that collaboration ended. And indeed, when describing- I guess the issue that comes about is the about phase. I mean, that's what gives pause. Why did it all of a sudden become interesting when it wasn't interesting when you didn't have their employees? Well, it was not interesting because they didn't come forward with- and there was testimony on this- they didn't come forward with anything that would give an advantage. They were also starting at the earliest stages. And this was one of Judge Brimmer's findings, is that even in these two allegedly overlapping areas out of 12 alleged trade secrets where they sought- in conjunction, both parties were at the earliest stages. And the evidence about what Loxo Oncology is actually doing in these areas is starting from scratch. Working with a different contractor, a different contract research organization, that has a huge library of its own compounds and doing what's called high-throughput screening and testing those. Or doing what's called benchmarking, which is simply looking at publicly available scientific research about what's out there. This is what companies do when they don't have a head start and when they're starting from scratch. That was the evidence the court was confronted with. And it was no abuse of discretion to find that that scenario didn't show a likelihood of irreparable harm before, and certainly not before trial. The other question Mr. Verhoeven presented was, why all this focus on what happens down the road in competition instead of what's happening now? But that was the evidence that Array presented extensively in support of their claims at the hearing and in their papers. They spent pages on it saying, we put a lot of work into this and a lot of it goes nowhere and a lot of it fails. And so here they are with programs that are at the earliest stages, and under cross-examination their CEO said, yeah, even this thing that we think is promising will probably go nowhere. And so you had a company starting from scratch. You have another company that's not much farther ahead, if at all, and there was no evidence of anything that would happen before trial. It was Array who said they faced competition in the clinical trial. Array would face a competitor down the road in this list of abstract hypothetical harms, and they couldn't show that any of that was likely to occur before trial. Well, going to that point, the two cases, the We Ride case and the Waymo case, one of the things that was in them that was sort of interesting when you talk about this developing technology issue is the question that there could be a harm if you could advance to the point that you could be attracting both personnel and money. Even if you've got a long horizon on this kind of research, scientific research of this sort, that if you start being able to attract the best scientists, if you start being able to attract money, and in some instances government money, you've made a tremendous benefit there. And so when you talk about this notion of you and them just being in the formative stages on this, was there any sense that you would be at such a point? There was no evidence presented that any of the alleged misappropriation here was positioning LOCSO to attract additional employees. That wasn't even an argument made at the hearing. How about money? Nor was there evidence about soliciting investment on the basis of these alleged trade secret areas. Keep in mind, a lot of this was this inevitable disclosure about what people have in their heads with no evidence of any use. The two overlapping areas, again, were early stage. There was discovery in this case. There were months and months of discovery. They could have sought discovery trying to show whether there was any investment being lured with these areas. There wasn't. There was no such evidence, and there certainly was no such evidence presented at trial. With regard to personnel, one of their arguments is that Dr. Brandhuber and Dr. Andrews came to LOCSO over a year before these other employees or independent contractors came, and so you can reasonably infer from that that this misappropriation involved Dr. Brandhuber and Dr. Andrews and that that led to the attraction of talent. Why isn't that a reasonable inference from the evidence? First, it wasn't argued at that point that trade secrets had actually been used and used to attract these people. Secondly, the question isn't just were you able to hire somebody, but was there irreparable harm? And on the subject of the hiring of the seven personnel, two of whom, by the way, were independent contractors who couldn't even get a job at Array, but those two plus the five, the evidence we introduced showed that the CEO of Array at the time they left stated publicly the departure of this small group of employees is not expected to impact our ongoing research efforts. They were saying publicly there's no harm from these people. But that's the converse of their theory. Their theory is that not that it disturbed, well, partly it is that it had disturbed or interrupted their development, but also that it gave a head start to LOCSO by giving them the opportunity to attract talent. But there was no evidence that any of those seven individuals who are the other accused misappropriators in this case were attracted because of any trade secret misappropriation. The evidence which was unrebutted, their testimony in declarations, and one witness came to testify at the full-day evidentiary hearing, was that they were attracted because they had been working on a collaboration with LOCSO for years, together, knew the people there, liked the work they were doing, the accomplishments they were achieving, and wanted to continue that work. This isn't a case of a company that just goes and raids strangers from another company. These scientists had worked together for years in an agreement that had no, between the companies, there was no non-solicitation and no non-compete. So Array was understood that it could hire from LOCSO and LOCSO could hire from Array. These scientists worked together. And at the end of that collaboration, which Array ended, LOCSO obtained exclusive rights to continue doing work in the areas of the collaboration technology, which these scientists at Array had worked on. So they could continue their work with people they knew and liked in Boulder, helping to cure cancer. And it's just, it's simply not, it's not the suspicious fact pattern of a case like Waymo, where 14,000 documents are taken, the witness takes the Fifth Amendment, there's a $680 million investment in that guy's company. It's just, it's just night and day. Well, going on, using the We Ride example, I mean, could it, would it, one of the things that, facts that they pointed out there, and I think it was an expert who said that, opined that it would have been impossible for them to independently develop technology within the same period of time, but for some disclosure to have taken place. Was there any similar testimony here about where your client was relative to the two areas of research that had occurred? In other words, absent any sort of communication of trade secrets, was the path of investigation that your client was undertaking, was that something that could have been done apart from that? So our witnesses and our experts testified that they absolutely could get where they were, particularly in the two accused areas where they started from scratch, where they had an independent scientist developing his own computer model, where they had a third-party contractor that had huge volumes of existing molecules to test in these areas, and that none of this showed a head start. Their expert, in general terms, talked about the fact that a company could get a head start from taking trade secrets, but that evidence was obviously not something the court found compelling. Well, see, that's the point, and of course this is your take on the record,  it's one thing to say, yes, with this kind of trade secret you could get a head. It's another thing to say, along the lines of we ride, it would be impossible for them to be where they are if this had not happened. I don't think the evidence in this record came anywhere near that. And, you know, these were the district court's findings, that there was no imminent risk, that there were speculative allegations of irreparable harm. And those determinations, those findings are reviewed for abuse of discretion. Clear errors. Clear errors. Yes. You know, the fact is that even in the Waymo case, the judge denied much of the preliminary injunction that they sought, and a district court opinion, certainly an unreported district court opinion, might be interesting, but it doesn't tell us that it would have been error for the district judge to reach a different conclusion. The question now is whether Judge Brimmer abused his discretion in finding that this evidence fell short, and he didn't. Turning, if I may briefly, to the heightened standard, unless your honors have other questions on this subject. The array faults Judge Brimmer for referring once in the order to a heightened standard being a heavily and compellingly standard, which the Ocentro case rejected the en banc procuring decision, although it said it's still a heightened standard. We're just not going to use those words. Why is this not an error here? Judge Brimmer referred to that in the context of saying whether there's a heightened standard at all, and he found that for the vast majority of the relief here, it's not a disfavored injunction. It's an injunction that would not alter the status quo. So there was no heightened standard. For the five employees and two independent contractors that you mentioned, but he specifically said that with regard to Dr. Brandhuber and Dr. Andrews, that array had to show heavily and compellingly the precise words that the en banc court rejected. That clearly is an error, is it not? Then we look at what the evidence of irreparable harm was, though, and his analysis there. We know he found the irreparable harm under the normally difficult standard was insufficient as to everybody else, and there was no differentiation in the alleged harm that array presented. So if it fell short for the five, those same failings would apply to the other two. Well, they were differently situated. They came a year after Dr. Brandhuber and Dr. Andrews came. They didn't have the role that Dr. Brandhuber and Dr. Andrews had with regard to 8A and 8E. So we really just don't know whether or not it affected Judge Brewer's analysis for those two defendants, Brandhuber and Andrews. Do you agree with that? If I can answer, I see that I'm almost out of time. But I think we can tell because the harm was undifferentiated harm. Although they were in different roles, the alleged irreparable injury, which fell short, was the same undifferentiated mass. Because the evidence presented on irreparable harm was so amorphous and so general and not tied to anything specific to 8E or 8A or what Brandhuber or Andrews were doing, the Court's rejection of irreparable harm across the board under the normally difficult standard, we think, applied to them as well. And also, under the Schreyer case, it would be harmless error if there's support in the record for the judge's decision, even after using those two words. Thank you, Your Honor. Thank you, Counsel. Can I have one minute to watch? No, you're done. Okay.